**UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION**

QUICKEN LOANS, INC.,

        Plaintiffs,

v.

NATIONWIDE BIWEEKLY ADMINISTRATION,
INC., and LOAN PAYMENT ADMINISTRATION,
LLC,

        Defendants.
_____/

Case No. 13-13431
Hon. Lawrence P. Zatkoff

## OPINION AND ORDER

AT A SESSION of said Court, held in the United States Courthouse,
in the City of Port Huron, State of Michigan, on February 7, 2014

PRESENT: THE HONORABLE LAWRENCE P. ZATKOFF
UNITED STATES DISTRICT JUDGE

### I. INTRODUCTION

This matter is before the Court on Plaintiff's Motion for Preliminary Injunction [dkt 1] and Defendants' Motion to Dissolve the Temporary Restraining Order [dkt 27]. Plaintiff's motion has been fully briefed. Plaintiff filed a response to Defendants' motion, but Defendants did not file a reply within the allotted time period. The Court finds that the facts and legal arguments are adequately presented in the parties' papers such that the decision process would not be significantly aided by oral argument. Therefore, pursuant to E.D. Mich. L.R. 7.1(f)(2), it is hereby ORDERED that the motions be resolved on the briefs submitted, without oral argument. For the following reasons, Plaintiff's motion is GRANTED and Defendants' motion is DENIED as moot.

## II. BACKGROUND

### A. FACTUAL BACKGROUND

Plaintiff Quicken Loans, Inc. ("Plaintiff") is a Michigan corporation headquartered in Detroit. Plaintiff is the nation's largest online retail mortgage lender and the third largest overall retail home lender. Plaintiff and its conglomerate of companies employ nearly 10,000 members in offices in Michigan, Ohio, Arizona, California and North Carolina. Plaintiff is also the 14th largest mortgage servicer in the United States. Plaintiff offers a variety of financial services to its mortgage servicing clients, including the option to enroll in a biweekly payment plan. The biweekly payment service is offered to Plaintiff's clients at no cost.

Defendant Nationwide Biweekly Administration, Inc. ("Defendant Nationwide") has been in business since 2002 and is one of the nation's largest independent administrators in the biweekly program industry. Defendant Nationwide offers borrowers with new mortgage loans the opportunity to set-up a biweekly program for paying their new mortgage loans. If borrowers select this service, called the "Interest Minimizer" program, Defendant Nationwide debits the bank accounts of its customers every two weeks and then processes their monthly mortgage loan payments when due, resulting in 26 biweekly debits, or 13 full payments over the course of the year. This translates into the borrowers making one month's additional mortgage payment per year which, in turn, reduces the amount of principal owed, shortens the life of the mortgage, and lessens the total interest paid.

Defendant Nationwide is not lender, and identifies potential customers from relying on public records of recently closed mortgages. Apprised of these potential customers, Defendant Nationwide—or its wholly-owned affiliate, Defendant Loan Payment Administration, LLC ("Defendant LP")—then mails letters to new mortgage borrowers and informs them of the opportunity Defendant Nationwide provides with its biweekly program.

This lawsuit centers on the form of solicitation letters that Defendants send to Plaintiff's clients. Both parties submit as evidence a photographic illustration of one of the envelopes containing a solicitation letter. The upper left corner of the envelope identifies Defendant LP as the sender. Inside the address window where the borrower's name and address appear, there is a reference to the name of the lender from whom the borrower obtained a mortgage—in this case, Plaintiff Quicken Loans. To the right of the address window reads: "[Defendant LP] is not affiliated with the lender."

Additionally, Plaintiff's brief refers to the substance of two solicitation letters. Similar to the envelope discussed above, the top of the letters contain Plaintiff's name as the "lender" and signify Defendant LP as the sender. Plaintiff highlights the following language from the first and second letters, respectively: "Quicken Loans has helped you in providing your mortgage loan, now let us help you eliminate your interest charges and shorten the term of your loan[;]" and "Regrettably Quicken Loans may not have made you aware of the option to setup a smaller biweekly program payment option for your mortgage loan." Though not referenced by Plaintiff, the bottom of both letters display a disclaimer: "[Defendant LP] is not affiliated, connected, or associated with the lender listed above. Information concerning your loan was obtained from public record. Reference to the lenders name is made strictly for loan identification purposes only."

Plaintiff complains that Defendants' use of the registered trademark, "QUICKEN LOANS" (the "Mark"), in the solicitation letters (1) confuses Plaintiff's clients as to the origin of Defendants' services or the parties' affiliation, (2) tarnishes Plaintiff's Mark, and (3) results in unfair competition.

**B. PROCEDURAL BACKGROUND**

Plaintiff filed a complaint and an *ex parte* motion for a temporary restraining order in Wayne County Circuit Court on July 25, 2013. On July 31, 2013, the state court entered the temporary restraining order requested by Plaintiff. On August 9, 2013, Defendants removed the action to this Court.

On August 15, 2013, and again on September 18, 2013, the Court entered stipulated orders whereby both parties agreed to "maintain the status quo"—or in other words, the temporary restraining order would remain in place—pending settlement discussions. After the parties reported to the Court that such discussions reached an impasse, the Court convened the parties for a scheduling conference on December 10, 2013, and set a briefing schedule for Plaintiff's Motion for a Preliminary Injunction.

Plaintiff's instant motion argues that it will be irreparably harmed unless Defendants are enjoined from further use of the Mark.

### III. LEGAL STANDARD

In determining whether or not to grant a preliminary injunction, a district court considers four factors: (1) the plaintiff's likelihood of success on the merits; (2) whether the plaintiff could suffer irreparable harm without the injunction; (3) whether granting the injunction will cause substantial harm to others; and (4) the impact of the injunction on the public interest. *Connection Distrib. Co. v. Reno*, 154 F.3d 281, 288 (6th Cir. 1998). *See also Hamilton's Bogarts, Inc. v. Michigan*, 501 F.3d 644, 649 (6th Cir. 2007).

A reviewing court generally will balance these factors, and no single factor will necessarily be determinative of whether or not to grant the injunction. *Connection Distrib. Co.*, 154 F.3d at 288. Courts, however, may grant a preliminary injunction even where the plaintiff fails to show a strong or substantial probability of success on the merits, but where he at least shows serious questions going to the merits and irreparable harm which decidedly outweighs any potential harm to the defendant if the injunction is issued. *Jones v. Caruso*, 569 F.3d 258, 277 (6th Cir. 2009) (quoting *Friendship Materials, Inc. v. Michigan Brick, Inc.*, 679 F.2d 100, 104 (6th Cir. 1982)).

# IV. ANALYSIS

### A. LIKELIHOOD OF SUCCESS ON THE MERITS

Under the first factor, a plaintiff must establish the likelihood of success on the merits by showing "more than a mere possibility of success." *Six Clinics Holding Corp. v. Cafcomp Sys., Inc.*, 119 F.3d 393, 402 (6th Cir. 1997) (citing *Mason County Med. Ass'n v. Knebel*, 563 F.2d 256, 261 n. 4 (6th Cir. 1977)). "[I]t is ordinarily sufficient if the plaintiff has raised questions going to the merits so serious, substantial, difficult, and doubtful as to make them a fair ground for litigation and thus for more deliberate investigation." *Certified Restoration Dry Cleaning Network, L.L.C. v. Tenke Corp.*, 511 F.3d 535, 543 (6th Cir. 2007) (citations omitted).

Plaintiff's complaint contains three counts: trademark infringement/misrepresentation of origin under Section 43(a)(1)(A) of the Lanham Act, 15 U.S.C. § 1125(a)(1)(A) (Count One); common law unfair competition (Count Two); and dilution by tarnishment under Section 43(c) of the Lanham Act, 15 U.S.C. § 1125(c) (Count Three). The Court considers the claims in turn below.

### i. Trademark Infringement/Misrepresentation of Origin claim (Count One)

The Lanham Act provides a private cause of action for violations of protected trademark rights:

> Any person who, on or in connection with any goods or services, or any container for goods, uses in commerce any word, term, name, symbol, or device, or any combination thereof . . . which—(A) is likely to cause confusion, or to cause mistake, or to deceive as to the affiliation, connection, or association of such person with another person, or as to the origin, sponsorship, or approval of his or her goods, services, or commercial activities by another person . . . shall be liable in a civil action by any person who believes that he or she is or is likely to be damaged by such act.

15 U.S.C. § 1125(a)(1)(A). The Sixth Circuit has adopted a two-step approach to consider claims under § 1125(a). First, a court must determine "whether the [plaintiff's] mark is protectable," and second, "whether there is a likelihood of confusion as a result of the would-be infringer's use of the mark." *See*

*Tumblebus Inc. v. Cranmer*, 399 F.3d 754, 761 (6th Cir. 2005). Only the second element—likelihood of confusion—is at issue here.

To prevail on its trademark infringement claim, Plaintiff must show that Defendants' use of its (Plaintiff's) Mark creates a "likelihood of confusion" regarding the origin of the goods offered by Plaintiff and Defendants or the parties' affiliation.[1] *Therma-Scan, Inc. v. Thermoscan, Inc.*, 295 F.3d 623, 629 (6th Cir. 2002). In determining whether a likelihood of confusion exists, this Court can weigh the following eight factors: (1) strength of the senior mark; (2) relatedness of the goods or services; (3) similarity of the marks; (4) evidence of actual confusion; (5) marketing channels used; (6) likely degree of purchaser care; (7) the intent of defendant in selecting the mark; and (8) likelihood of expansion of the product lines. *Frisch's Rests. Inc., v. Elby's Big Boy of Steubenville, Inc.*, 670 F.2d 642, 648 (6th Cir. 1982). Notably, not all of these factors will be relevant in a given case, and the "[t]he ultimate question remains whether relevant consumers are likely to believe that the products or services offered by the parties are affiliated in some way." *Homeowners Group, Inc. v. Home Mktg. Specialists, Inc.*, 931 F.2d 1100, 1107 (6th Cir. 1991). *See Daddy's Junky Music Stores, Inc. v. Big Daddy's Family Music Ctr.*, 109 F.3d 275, 280 (6th Cir. 1997) ("The touchstone of liability [for trademark infringement] is whether the defendant's use of the disputed mark is likely to cause confusion among consumers regarding the origin of the goods offered by the parties."). Because the instant case is somewhat unique in the sense that only one trademark (Plaintiff's Mark) is involved here, the Court will primarily rely on factor (4)—evidence of actual confusion—as a guide in its "likelihood of confusion" analysis.

"Evidence of actual confusion is undoubtedly the best evidence of likelihood of confusion." *Daddy's*, 109 F.3d at 284 (quoting *Wynn Oil Co. v. Thomas*, 839 F.2d 1183, 1188 6th Cir. 1988)). If actual confusion exists, the weight to accord such evidence varies depending upon both the type and

---

[1] Defendants would have this Court believe that they are using Plaintiff's Mark in a "non-trademark way." *See Hensely Mfg. v. ProPride, Inc.*, 579 F.3d 603, 610 (6th Cir. 2009). The Court has reviewed *Hensely* and finds its application to be inapposite to the instant case.

amount of confusion that occurs. *Homeowners Group*, 931 F.2d at 1110. The Sixth Circuit has explained that "the existence of only a handful of instances of actual confusion after a significant time . . . may even lead to an inference that no likelihood of confusion exists." *Id.*

Here, the crux of Plaintiff's trademark infringement/misrepresentation of origin theory is that Defendants' use of the Mark in the solicitation letters creates "actual confusion." To support its claim, Plaintiff submits as evidence a detailed transcribed summary of 75 calls from its customers from July 24 through August 14, 2013, wherein those customers purportedly believed Defendants were affiliated with Plaintiff or that Defendants' biweekly program was administered by Plaintiff.[2]

The Court's review of the 75 calls reveals that Defendants' use of Plaintiff's Mark in its solicitation letters likely supports the notion that Plaintiff's clients suffered from "actual confusion." To illustrate, some of Plaintiff's clients asked who the solicitation letters were coming from and if Plaintiff and Defendants had "any relationship," while others commented that they called Defendants under the assumption that they were "dealing" with Plaintiff. As the Sixth Circuit acknowledged in *Daddy's Junky Music Stores*, "[b]earing in mind that a successful Lanham Act plaintiff only must show a sufficient *potential* of confusion, not actual confusion, the fact that some confusion already has occurred favors plaintiff at least to some extent." 109 F.3d at 284 (emphasis in original). The examples which Plaintiff provides to the Court support a finding that these clients were actually confused over the origin of Defendants' services or Plaintiff's relationship with Defendants. This conclusion is further bolstered by the fact that the parties have only been competing in the market for a short period of time. As of 2010, Plaintiff was primarily a mortgage lender and serviced on average only 5,000 loans. Between 2010 and the date in which Plaintiff filed its lawsuit in state court (July 2013), Plaintiff was servicing approximately 691,000 of the loans it originated and, importantly, had launched its own biweekly payment plan. Plaintiff and Defendants have thus been direct competitors in the same industry—as mortgage

---

[2] Plaintiff also provided the Court and Defendants with the actual telephonic recordings of these calls.

servicers—for only three to four years. *See Homeowners*, 931 F.2d at 1110. Based on this relatively short time, the Court finds the instances of confusion recounted above significant and this factor tilts in Plaintiff's favor.

In sum, when considering the touchstone inquiry "whether relevant consumers are likely to believe that the products or services offered by the parties are affiliated in some way," *Homeowners*, 931 F.2d at 1107, the Court finds Plaintiff's proffer of actual confusion among its clients creates a likelihood of confusion over the parties' affiliation and the source of Defendants' biweekly payment program. Plaintiff has therefore demonstrated a likelihood of success on the merits of its trademark infringement/misrepresentation of origin claim.

### ii. Common Law Unfair Competition (Count Two)

The same likelihood of confusion test which applies in the context of Plaintiff's Section 43(a) Lanham Act claim applies with equal force to its common law claim of unfair competition under Michigan law. *See Wynn Oil Co. v. Am. Way Serv. Corp.*, 943 F.2d 595, 604–05 (6th Cir. 1991). Accordingly, the Court likewise finds that Plaintiff has a likelihood of success on the merits of its unfair competition claim.

### iii. Dilution by Tarnishment claim (Count Three)

"Dilution law, unlike traditional trademark infringement law . . . is not based on a likelihood of confusion standard, but only exists to protect the quasi-property rights a holder has in maintaining the integrity and distinctiveness of his mark." *AutoZone, Inc. v. Tandy Corp.*, 373 F.3d 786, 801 (6th Cir. 2004) (quoting *Kellogg Co. v. Toucan Golf, Inc.*, 337 F.3d 616, 628 (6th Cir. 2003)). To prevail on a federal dilution claim under the Trademark Dilution Revision Act ("TDRA"), 15 U.S.C. § 1125(c), a plaintiff must show: 1) that its trademark is famous and distinctive; 2) that the defendant's use of the mark was in commerce; 3) that the defendant's use of the mark in commerce began after the mark became

famous; and 4) that the defendant's use of the mark likely caused dilution of the distinctive quality of the mark. 15 U.S.C. § 1125(c). The clause used in the new statute—"likely to cause dilution"—significantly changed the meaning of the law and functions to no longer require a showing of "actual harm." *See V Secret Catalogue, Inc. v. Moseley*, 605 F.3d 382, 388 (6th Cir. 2010).[3]

Defendants first challenge the "famous and distinctive" factor. Defendants contend that Plaintiff's Mark is not entitled to "famous" status and, in any event, has only obtained "niche fame." Citing to courts outside this Circuit, Defendants argue that "niche fame" falls insufficient under the TDRA. *See Maker's Mark Distillery, Inc. v. Diageo North America, Inc.*, 703 F. Supp. 2d 671 (W.D. Ky. 2010); *Bd. of Regents, Univ. of Texas Sys. v. KST Electric, Ltd.*, 550 F. Supp. 2d 657 (W.D. Tex. 2008). The Court agrees with Defendants' position.

Under the TDRA, a mark is famous if it "is widely recognized by the *general consuming public of the United States* as a designation of source of the goods or services of the mark's owner." 15 U.S.C. § 1125(c)(2)(A) (emphasis added). As other courts have recognized, adding the term, "general consuming public," to the TDRA's 2006 revisions presumably eliminates any possibility that niche fame—something viable prior to 2006—can justify a basis for finding a mark famous. *See Maker's Mark*, 703 F. Supp. 2d at 697–98. To guide a court in its determination of whether a mark is famous, the TDRA lists four factors to consider:

> (i) The duration, extent, and geographic reach of advertising and publicity of the mark, whether advertised or publicized by the owner or third parties;
>
> (ii) The amount, volume, and geographic extent of sales of goods or services offered under the mark;

---

[3] The Court briefly pauses to note a relevant, and rather recent, change in this statute. The prior version of 15 U.S.C. § 1125(c)(1) required an *actual* showing of dilution. The 2006 revision does not demand show a showing, rather the statute now states that "[t]he owner of a famous mark . . . shall be entitled to an injunction against another person who, at any time after the owner's mark has become famous, commences use of a mark . . . in commerce that is *likely* to cause dilution . . . ." 15 U.S.C. § 1125(c)(1) (emphasis added).

> (iii) The extent of actual recognition of the mark;
>
> (iv) Whether the mark was registered . . . on the principal register.

15 U.S.C. § 1125(c)(2)(A).

For purposes of this motion, the Court finds that Plaintiff has offered sufficient evidence related to the first and fourth factors. Regarding the second and third factors, however, the Court can make no such finding.

When reviewing the 2006 TDRA revisions in relation to certain brands, courts have deemed famous brands such as "Pepsi" and "Nike." *Pepsico, Inc. v. #1 Wholesale, LLC*, No. 07-cv-367, 2007 WL 2142294 (N.D. Ga. Jul. 20, 2007); *Nike Inc. v. Nikepal Int'l, Inc.*, 2:05-cv-1468, 2007 WL 2782030 (E.D. Cal. Sept. 18, 2007). In this Circuit, brands such as "Audi" and Victoria's Secret" enjoy similar fame. *Audi AG v. D'Amato*, 469 F.3d 534 (6th Cir. 2006); *V Secret*, 558 F.Supp. 2d 734.

Oppositely, in *Board of Regents, University of Texas Systems*—a case on which Defendants rely—the court held that the Texas longhorn logo was not famous for purposes of the TDRA. There, the court rejected the plaintiff's circumstantial evidence of fame because it all related to the use of the logo at, or in relation to, sporting events. This "niche fame," the court reasoned, "d[id] not necessarily mean that the longhorn logo is so ubiquitous and well-known to stand toe-to-toe with Buick or KODAK." *Bd. of Regents, Univ. of Texas Sys.*, 550 F. Supp. 2d at 678. *See also Maker's Mark*, 703 F. Supp. 2d at 699 (determining that the Marker's Mark red wax seal was not famous, as the company failed to offer evidence outside of "niche fame").

Here, the Court seriously questions whether general consumers outside the State of Michigan "*widely recognize*" Plaintiff's Mark. Aside from its self-proclaimed acclamations, Plaintiff offers no real proof to dispel the Court's concern. While the Court certainly does not question the impact Plaintiff has had on the mortgage industry, the resulting success appears to have earned the company "niche fame."

10

Plaintiff does not—nor could it—argue that its evidence of "fame," such as its recognition as one of the largest mortgage lenders in the nation, places it on similar ground as giants like Nike, Pepsi, or Victoria's Secret. These brands not only enjoy a strong national presence, but also have significant international fame. In the end, Plaintiff's evidence does not persuade the Court that it possesses similar status as those brands mentioned above. Therefore, because it is unlikely that Plaintiff's Mark can be considered "famous," the Court finds that Plaintiff's dilution claim does *not* have a likelihood of success on the merits.

### B. IRREPARABLE HARM

The Court next considers whether Plaintiff will suffer irreparable injury without the injunction. *Tenke*, 511 F.3d at 550. A plaintiff's harm is irreparable if "it is not fully compensable by monetary damages." *Overstreet v. Lexington–Fayette Urban County Gov't*, 305 F.3d 566, 578 (6th Cir. 2002); *see Basicomputer Corp. v. Scott*, 973 F.2d 507, 511–12 (6th Cir. 1992) ("The loss of customer goodwill often amounts to irreparable injury because the damages flowing from such losses are difficult to compute."). Moreover, "[a] finding of irreparable injury ordinarily follows when a likelihood of confusion or possible risk to reputation appears." *Wynn II*, 943 F.2d at 608. As determined above, Plaintiff has demonstrated a likelihood of success on Counts I and II of his complaint and therefore will incur irreparable harm without the injunction.

Nonetheless, the Court would be remiss to completely ignore Plaintiff's delay in seeking injunctive relief. Defendants assert that Plaintiff became aware in April 2010 that Defendants were using Plaintiff's Mark in solicitation letters similar to the ones described in this Opinion. As Defendants would have it, Plaintiff's delay in petitioning the Court for injunctive relief surely eviscerates any contention of imminent or irreparable harm.

While Defendants' theory—at first glance—is inviting, Plaintiff offers the Court a plausible justification for its delay. In 2010, Plaintiff was not servicing the majority of the mortgage loans it provided, nor did it administer its own biweekly payment program. As of July 2013, however, Plaintiff's Director of Business Intelligence testified that Plaintiff services approximately 690,000 of its loans and offers its clients the biweekly payment option. Thus, Plaintiff presents credible evidence that Defendants' solicitation letters are now causing the heightened flux of complaints and confusion—or "irreparable" harm—because of Plaintiff's recent (1) transition into increased mortgage servicing and (2) creation of a biweekly payment program.

When considering the totality of the circumstances, the Court finds the irreparable harm factor weighs in favor of Plaintiff.

## C. SUBSTANTIAL HARM TO OTHERS

The Court must also consider "whether the issuance of the injunction would cause *substantial* harm to others." *Tumblebus*, 399 F.3d at 760 (emphasis added). Based on the record, the Court can identify no third party that would be substantially harmed by the granting of an injunction. Further, any potential harm of an injunction to Defendants would be minimal, given that removal of Plaintiff's Mark from its solicitation letters would not require Defendants to cease business operations. In fact, Defendants twice stipulated in the instant case to remain subject to the state court's grant of a temporary restraining order pending settlement discussions. For these reasons, this factor weighs in Plaintiff's favor.

## D. PUBLIC INTEREST

"The public interest is served by protecting one's trademark rights and avoiding confusion in the marketplace." *Midwest Guaranty Bank v. Guaranty Bank*, 270 F. Supp. 2d 900, 924 (E.D. Mich. 2003). Reducing the risk of customer confusion undoubtedly serves the public interest. Because the Court

concludes that the public is likely to be confused over the origin of Defendants' services and the parties' affiliation, this factor also points towards the issuance of a preliminary injunction.

## V. CONCLUSION

Accordingly, for the reasons set forth above, IT IS HEREBY ORDERED that Plaintiff's Motion for a Preliminary Injunction [dkt 1] is GRANTED.  Pending a subsequent order by this Court or a final trial on the merits, the Court hereby ORDERS that Defendants (including its officers, agents, servants, employees, attorneys, successors and assigns, and all person or entities acting in concert or participation with them) are:

1. enjoined and restrained from (a) using "Quicken" or "Quicken Loans" in any of their marketing, advertising or promotional materials, (b) stating or suggesting that Plaintiff acted improperly in generating or servicing its customers' loans, and (c) stating or suggesting that Defendants are affiliated, sponsored or endorsed by Plaintiff, or any making any other type of representation likely to cause confusion in the mind of a consumer or to deceive the public into believing that Defendants or their services are related to Plaintiff or its services; and

2. required to file with the Court and serve on Plaintiff's counsel, within thirty (30) days after entry of this Opinion and Order, a sworn written statement under oath setting forth in detail the manner and form in which Defendants have complied with this Opinion and Order as provided in 15 U.S.C. § 1116(a).

IT IS FURTHER ORDERED that Defendants' Motion to Dissolve the Temporary Restraining Order [dkt 27] is DENIED as moot, as the Court's entry of the Preliminary Injunction displaces the temporary restraining order that was previously in effect.

IT IS SO ORDERED.

Date: February 7, 2014             s/Lawrence P. Zatkoff
                                                                          Hon. Lawrence P. Zatkoff
                                                                          U.S. District Judge